# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

WILLIAM PERUGINI,                 :
                                      :
               Plaintiff,             :
                                        :
v.                                 :       Civil No. 3:08cv404 (MRK)
                                        :
STRYKER ORTHOPAEDICS, STRYKER     :
SALES CORPORATION, and STRYKER      :
CORPORATION,                     :
                                        :
            Defendants.         :

## RULING AND ORDER

Pending before the Court are cross-motions for summary judgment on Plaintiff William Perugini's claims of breach of contract, promissory estoppel, and retaliation under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(4). Mr. Perugini has brought these claims against his former employer, Stryker Orthopaedics, as well as Stryker Sales Corporation and Stryker Corporation [collectively referred to as "Stryker"]. For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment [doc. # 62] is DENIED and Defendants' Motion for Summary Judgment [doc. # 60] is GRANTED.

## I.

The facts in this case are mostly undisputed and have been discussed previously at length. *See Perugini v. Stryker Orthopaedics*, No. 3:05CV1289, 2007 WL 601454, *1-4 (D. Conn. Feb. 22, 2007) ("*Perugini I*"); *Perugini v. Stryker Orthopaedics et al.*, No. 3:08CV404, 2009 WL 179807,

*1 (D. Conn. Jan. 21, 2009) ("*Perugini II*").  The Court assumes familiarity with these opinions and only summarizes the most relevant facts here; additional facts will be introduced as needed.  This suit was brought by William Perugini against his former employer, Stryker Orthopaedics, for whom he worked from 2002 until January of 2005, when he was laid off as part of a nationwide restructuring.  In May 2004, Mr. Perugini found a *Hustler* magazine in his company mailbox.  Upset, he brought this to the attention of his immediate supervisor, Gordon Little, the Branch Manager of Stryker's Western New England ("WNE") Branch; as well as Lisa Hall, Stryker's Human Resources Manager.  Mr. Perugini told both that he only wanted the incident documented; that he did not want it to be investigated; and that he wanted it to be kept confidential.  Despite his wishes, an investigation was ultimately conducted, which concluded on June 30, 2005 without finding the perpetrator.  When Mr. Perugini was laid-off on January 7, 2005, he believed that it was retaliation for his complaint about the magazine; and on April 19, 2005, he filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") to that effect.  After receiving a release of jurisdiction, he filed *Perugini I*, which claimed retaliation under Title VII and the CFEPA; breach of contract; and promissory estoppel – the last two based on alleged promises from Mr. Little and Ms. Hall that they would keep the *Hustler* incident confidential.

In April 2006, Mr. Little resigned as the WNE Branch Manager, and Mr. Perugini – now employed by a Stryker competitor – applied for the open position in July 2006.  Tony Moutinho, Stryker's Area Vice President, was solely responsible for filling the vacancy.  As was his practice, he looked first for qualified internal candidates, and would only look to external candidates after exhausting the internal possibilities.  After interviewing two internal candidates, he hired one of them, Vincent Morgera, on September 1, 2006, without ever interviewing or considering any external

candidates, including Mr. Perugini.  In fact, Mr. Moutinho was not even aware of the identities of

the external candidates, as all of their applications were maintained by Cecilia Brennan, a Stryker

Recruiter.

On January 9, 2007, the Court heard oral arguments on Stryker Orthopaedics's motion for

summary judgment in *Perugini I*.  On February 22, 2007, the Court granted Defendant summary

judgment as to Mr. Perugini's retaliation claim under Title VII – the only federal claim – and

declined to exercise supplemental jurisdiction over the remaining claims of retaliation under the

CFEPA, breach of contract and promissory estoppel.  *See* 2007 WL 601454 at *15.

Three weeks later, on March 15, 2007, Mr. Perugini filed another CHRO complaint, this one

alleging that Stryker's failure to hire him for the WNE Branch Manager position was unlawful

retaliation for his filing of *Perugini I*.  Eleven months after that, on February 15, 2008, Mr. Perugini

re-filed the three claims dismissed without prejudice in *Perugini I* in Connecticut state court, adding

Stryker Sales Corporation and Stryker Corporation as defendants.[1]  That case was subsequently

removed to federal court on the basis of diversity jurisdiction.  *See Perugini II*, 2009 WL 179807 at

*1.  On June 13, 2008, Perugini filed an amended complaint [doc. # 23], adding new claims of

retaliation under Title VII and the CFEPA against all Defendants for the failure to hire him as the

WNE Branch Manager.  On January 21, 2009, the Court granted Defendants' motion to dismiss

Count One of the Amended Complaint, which was a CFEPA retaliation claim identical to the Title

VII claim that was the subject of the summary judgment ruling in the previous suit.  *Id.* at *1-2.

---

[1]Plaintiff's counsel stated during oral argument that Stryker Sales Corporation and
Stryker Corporation were named as defendants because, at the time the Complaint was filed,
Plaintiff did not know whether Stryker Orthopaedics still existed.  He conceded, as both
companies argued, that since they never employed Mr. Perugini, they are entitled to summary
judgment on all counts, which the Court hereby grants.

Finally, on May 28, 2009, all parties moved for summary judgment on the four remaining counts, and on September 10, 2009, the Court heard oral arguments.

## II.

The standard for considering a motion for summary judgment is a familiar one and will not be discussed at length here. *See, e.g.*, *Perugini I*, 2005 WL 3448054 at *4. In short, the purpose of summary judgment is not to resolve any factual disputes, but instead to see if there *are* any facts material to a claim that remain in dispute. The burden is on the moving party to show that there are no disputed issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). Once that burden has been met, in order to defeat summary judgment the non-moving party must come forth with specific facts, supported by non-conclusory, admissible evidence, that demonstrate the existence of a dispute of material fact. *See* Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Finally, although the Second Circuit has cautioned that district courts should be careful "about granting summary judgment to an employer in a discrimination case when the employer's intent is in question" because of the difficulties inherent in unearthing direct evidence of discriminatory intent, *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), "even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Id. See also Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## III.

The Court first considers Mr. Perugini's retaliation claims. Title VII retaliation claims are analyzed under the familiar three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Burlington Northern v. White*, 548 U.S. 53, 67

(2006).  Since Connecticut construes the CFEPA to be identical to Title VII, *see Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 103 (Conn. 1996), the Court will discuss Mr. Perguini's claims of retaliation under Title VII and the CFEPA together.

The retaliation claims are limited to the WNE Branch Manager position only.  Although the Amended Complaint contains references to other job openings at Stryker for which Mr. Perugini says he was not considered despite his qualifications – such as trauma management, upper extremity representative and trauma sales representative – Mr. Perugini admits that he never applied for these positions.  Barring circumstances not present here, Mr. Perugini cannot premise a retaliation claim on Defendants' failure to hire him for positions for which he never applied.  *See Petrosino v. Bell Atlantic*, 385 F .3d 210, 228 (2d Cir. 2004); *Alphonse v. State of Conn. Dept. of Admin. Servs.*, No. 02CV1195 (MRK), 2004 WL 904076, at *5 (D. Conn. Apr. 21, 2004).

The Court assumes without deciding that Mr. Perugini has made out a *prima facie* case of retaliation.  Under step two of the *McDonnell Douglas* test, Defendants have also articulated a legitimate, non-discriminatory reason for not hiring Mr. Perugini for the WNE Branch Manager position – namely,  that in accordance with his practice and policy, Mr. Moutinho only considered two internal candidates.  *See Summers v. Harvard Univ.*, 397 F. Supp. 2d 166, 173 (D. Mass. 2005) (holding that an employer's preference in hiring internal candidates to fill open positions is a legitimate, non-discriminatory reason); *Perkins v. Doyon Universal Servs.*, 151 P.3d 413, 417 (Alaska 2006) (same).  Mr. Perugini therefore must produce evidence that reasonably supports a conclusion that Defendants' proffered reason for not hiring him was pretext for prohibited retaliation. *See Norville v. Staten Island University Hosp.*, 196 F.3d 89, 98 (2d Cir. 1999) (affirming a grant of summary judgment to an employer because the plaintiff "produced no evidence that the hospital's

reasons, even if pretextual, served as pretext for the [alleged] discrimination."); *Fisher v. Vassar College,* 114 F.3d 1332, 1339 (2d Cir. 1997) (en banc) ("[An employment discrimination] plaintiff may prevail only if an employer's proffered reasons are shown to be a pretext *for discrimination*.") (emphasis in original).  Mr. Perugini has not brought forth such evidence.

The primary obstacle to Mr. Perugini's claims of retaliation is that there is no genuine dispute that Mr. Moutinho – the sole decision maker here – ever knew Mr. Perugini had applied for the position.  In fact, Mr. Moutinho testified that since he had identified two qualified internal candidates early on in the hiring process, he never considered or even looked at the applications from any external candidates.  Without some evidence that Mr. Moutinho even knew that Mr. Perugini had applied for the job, Mr. Perugini's efforts to attribute retaliatory animus to Mr. Moutinho are unavailing.  *See McLee v. Chrysler Corp.*, 109 F.3d 130, 137 (2d Cir. 1997) (holding that the discrimination must be attributed to the decision maker directly).

Plaintiff's counsel conceded during oral argument that there is no evidence that Mr. Moutinho knew Mr. Perugini had applied for the job; and further, that if Mr. Moutinho is believed, Plaintiff cannot sustain his retaliation claim.  Nonetheless, Plaintiff's counsel argued that there are three reasons to question Mr. Moutinho's credibility sufficient to defeat summary judgment.

First, Plaintiff asserts that Mr. Moutinho lied in his deposition about when he first learned about *Perugini I*.  *See* Pl.'s Mem. in Supp. of Mot. for Summ. J. [doc. # 62] at 14, 20.  According to Plaintiff, Mr. Moutinho testified on March 17, 2009 that he did not learn about *Perugini I* until he received the notice of his deposition in *Perugini II*.  Plaintiff contends that this is directly contradicted by the fact that Mr. Moutinho signed Stryker's Verified Answer – which discusses *Perugini I* – to Plaintiff's second CHRO complaint on June 15, 2007.  *See id.* at 14.  An examination

6

of the deposition transcript cited by Plaintiff, however, does not support this allegation.  According to the transcript, Plaintiff's counsel asked Mr. Moutinho, "How did you learn of this lawsuit?", to which Mr. Moutinho stated that, "I learned when I got a phone call that I would have to be part of a deposition."  Moutinho Dep. [doc. # 62, Ex. X] 9:6–10.  At the time of Mr. Moutinho's deposition, the only lawsuit to which Plaintiff's counsel could have been referring was the instant one; and there is simply no reason to believe, as Mr. Perugini apparently asserts, that Mr. Moutinho would have understood a question about "this lawsuit" to refer to *Perugini I*, which had been dismissed some two years prior.

Mr. Perugini's second attack on Mr. Moutinho's credibility is to argue that although he stated that only internal candidates were considered for the WNE Branch Manager position, Mr. Moutinho actually did contact and consider an external candidate.  *See* Pl.'s Mem. in Supp. of Mot. for Summ. J. at 13-14, 20.  Here again, however, the record does not support Plaintiff's assertion.  Mr. Perugini is referring to Bob McInerney, an employee of a Stryker competitor, who Mr. Moutinho contacted shortly after Mr. Little resigned to see if he would be interested in turning the WNE Branch into an independent agency.  If he had been so interested, Stryker no longer would have run the WNE Branch directly; instead, it would have contracted with the new agency for it to sell Stryker's products.  *See* Moutinho Aff. [doc. # 60] at ¶¶ 9-12.  It was only after Mr. McInerney said that he was not interested in making the Branch an independent agency that Mr. Moutinho considered the internal applicants to fill the vacancy.  *Id*.

Mr. Perugini asserts that since Mr. Moutinho contacted Mr. McInerney about turning the Branch into an agency, Mr. Moutinho was not being truthful when he said that he did not consider any external candidates for the Branch Manager position.  But that is clearly not the case; Mr.

McInerney was not a candidate for the position at all.  In fact, had he agreed to turn the Branch into

an agency, that would have effectively eliminated the position of WNE Branch Manager altogether.

The two scenarios – turning the Branch over to an independent contractor versus hiring an employee

to run it directly – are simply too different to support either the allegation that Mr. Moutinho is not

credible or an inference of discrimination based on disparate treatment of similarly-situated

individuals.  *See, e.g.*, *Ahern v. Shinseki*, No. 05-117-ML, 2009 WL 1615402, *2 (D.R.I. June 9,

2009) (holding that it was "beyond dispute that Plaintiffs, as employees, were not similarly situated

to the [independent contractors].");  *Barbour v. United Beechcraft*, No. 96C50251, 1998 WL 803417,

*6 (N.D. Ill. Nov. 10, 1998) (holding that independent contractor and plaintiff-employee "are simply

not similarly situated and it is impossible to compare the two.").   *See generally McGuinness v.*

*Lincoln Hall*, 263 F.3d 49, 53 (2d. Cir. 2001) ("[T]he plaintiff must show that she shared sufficient

employment characteristics with that comparator so that they could be considered similarly

situated.").

Finally, Mr. Perugini attempts to cast doubt on Mr. Moutinho's assertion that it was his

consistent practice to first consider internal candidates to fill Branch Manager positions.  Mr.

Perugini asserts that "the majority of hires for Stryker Orthopaedics come from outside the

organization," including at least four individuals who have been hired since his termination to work

either as Branch Sales Managers or Trauma Sales Managers.  Perugini Aff. [doc. # 66, Ex. B] ¶ 10.

However, Mr. Perugini did not undertake any discovery designed to verify whether his hearsay

assertion is correct.  Even assuming that Mr. Perugini's testimony were admissible – a point on

which the Court is quite skeptical – Mr. Perugini's statements about these lower level positions does

nothing to dispute or cast doubt upon Mr. Moutinho's statement about his practice in regards to

filling Branch Manager vacancies.

In sum, Mr. Perugini has failed to bring forth any evidence to reasonably assail Mr. Moutinho's credibility or to create a genuine issue of material fact.  Despite full access to discovery, Mr. Perugini has been unable to produce any evidence that even suggests that Mr. Moutinho ever considered external candidates, or that he was even aware that Mr. Perugini had applied for the job. There are additional problems with Mr. Perugini's retaliation claims, but given that Mr. Perugini has failed to produce any evidence that could lead a reasonable jury to conclude that Defendants' legitimate, non-discriminatory reason for not hiring him is actually a pretext for a retaliatory motive, the Court need not go further.  Summary judgment is granted to Defendants on the Title VII and CFEPA claims.

## IV.

In order to sustain his breach of contract claim, Mr. Perugini must show four things: the formation of an agreement with Defendants; that he performed his part of the agreement; that Defendants breached the agreement by failing to perform; and that he was damaged by that breach. *See Bouchard v. Sundberg*, 80 Conn. App. 180, 189 (Conn. App. Ct. 2003).

In his Amended Complaint, Mr. Perugini seems to premise his breach of contract claim on his agreement to accept employment from Stryker in exchange for its assurances, presumably that stated in its policies, to maintain confidentiality of complaints made to Human Resources.  *See* Am. Compl. ¶¶ 36-37 ("In exchange for the promise of confidentiality, Perugini accepted employment with, and rendered services to, Stryker.").  Insofar as Mr. Perugini's breach of contract claim is premised on Stryker's policies in the Employee Handbook – which Mr. Perugini consulted just before complaining about the *Hustler* magazine – the Court agrees with Defendants that, as a matter

of law, there is no contract. *See, e.g.*, *Owen v. Georgia-Pacific Corp.*, 389 F. Supp. 2d 382, 390-92 (D. Conn. 2005); *Davis v. Liberty Mut. Ins. Co.*, 218 F. Supp. 2d 256, 260 (D. Conn. 2002); *Foster v. Mass. Mut. Life Ins. Co.*, No. 3:02CV1433, 2004 WL 950827, *3 (D. Conn. Apr. 14, 2004).  Not only did the Handbook contain a prominent disclaimer disavowing any intent to form a contract, but it states explicitly that upon the receipt of a complaint of harassment, Stryker "will promptly and thoroughly investigate" the complaint, and promises confidentiality only "to the extent possible." *See* Stryker Handbook [doc. # 62, Ex. I] at 6.

In moving for summary judgment, though, Mr. Perugini appears to premise his breach of contract claim on verbal assurances of confidentiality allegedly made by Ms. Hall and Mr. Little in connection with the *Hustler* complaint.  *See* Pl.'s Mem. in Supp. of Mot. for Summ. J., at 22.  Insofar as that is the basis of his claim, Mr. Perugini is correct that disclaimers in the Handbook would not necessarily preclude the formation of a contract.  *See Thompson v. Revonet, Inc., et al.*, No. 05CV168, 2005 WL 3132704, *2 (D. Conn. 2005) ("Even when a handbook contains a disclaimer of contractual intent, contradictory statements by the employer can lead to liability."); *Holt v. Home Depot*, No. 00CV1578, 2004 WL 178604, *1 (D. Conn. Jan. 22, 2004) (holding that an employer's assurances that employees who availed themselves of its open door policy would not be penalized could be viewed as binding notwithstanding a general disclaimer in the employee handbook).

But even setting aside the Handbook, Mr. Perugini has not presented any evidence that there was any agreement through which Defendants contracted to keep the *Hustler* incident confidential. Under Connecticut law, "an agreement must be definite and certain as to its terms and requirements." *Perricone v. Perricone*, 292 Conn. 187, 223 (Conn. 2009).  "Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract

unless the terms of the contract are reasonably certain." Restatement (Second) of Contracts § 33(1). It is undisputed that Ms. Hill and Mr. Little told Mr. Perugini that they were going to conduct an investigation into the *Hustler* incident. Logically, this would have to involve questioning other people who may have information about how the magazine ended up in Mr. Perugini's mailbox. And yet, Mr. Perugini argues in all of his filings that "Mr. Little and Ms. Hall assured the Plaintiff the Company would respect his wishes to keep the complaint confidential." Pl.'s Mem. in Supp. of Mot. for Summ. J., at 22; Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. [doc. # 66], at 20; Pl.'s Reply in Supp. of Mot. for Summ. J. [doc. # 68], at 7.

Once more, the factual record does not support Mr. Perugini's assertions. When asked if Ms. Hill and Mr. Little "assured you that they would keep the fact that you complained in complete confidence," Mr. Perugini testified that "I was adamant that they do that, and they assured me that they would maintain that confidence, but they had to do their own investigation." Perugini I Dep. [doc. # 60, Ex. C] 134:6–11. And when asked whether he was told that they "would keep it completely confidential" or rather, that, "pursuant to the policy, [they would] endeavor, to the extent possible, [to] maintain the confidentiality during the investigation," Mr. Perugini testified that he could not recall. *Id.* 134:15–25. Taking the evidence in the light most favorable to Mr. Perugini, all that is present here are vague assurances that although Defendants would conduct an investigation, they would seek to maintain some indeterminate level of confidentiality. But since Mr. Perugini cannot say the extent of confidentiality allegedly promised him, a reasonable jury would not be able to say, for example, whether there is any evidence that the Defendants ever breached the contract. *See* Restatement (Second) of Contracts § 33(2) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving

an appropriate remedy."). Therefore, whatever undefined assurances of confidentiality Mr. Perugini received, they were insufficient, as a matter of law, to create an enforceable contract. *Id.*; *see also Dunham v. Dunham*, 204 Conn. 303, 313 (Conn. 1987) ("[T]he vague statements allegedly made by the defendant . . . did not give rise to an enforceable contract"), *overruled in part on other grounds by Santopietro v. New Haven*, 239 Conn. 207, 213 n.8 (Conn. 1996).

Here, too, there are additional problems with this claim that the Court need not discuss. Summary judgment is granted to Defendants on the breach of contract claim.

## V.

To prevail on his promissory estoppel claim, Mr. Perugini must demonstrate that the Defendants made him a clear and definite promise that they should have expected him to rely upon, and that he actually did rely upon that promise to his detriment. *See D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch.*, 202 Conn. 206, 213 (Conn. 1987). This claim fails for two reasons. First, similar to his breach of contract claim, Mr. Perugini has not identified any clear and definite promise by Defendants. The only support for the existence of a promise is Mr. Perugini's own testimony; and yet, as discussed above, he could not recall what he had been promised as to the confidentiality of his complaint. *See* Perugini I Dep. 134:6–25. If Mr. Perugini himself cannot identify any clear and definite representations that could be considered promissory, there would be no basis on which a reasonable jury could find in his favor on this claim. *See D'Ulisse-Cupo*, 202 Conn. at 215-16. Second, Mr. Perugini testified that the purported assurances of confidentiality were given to him *after* he complained about the magazine in his mailbox. *See* Perugini I Dep. 118-19; 133-34. Given this sequencing, Mr. Perugini cannot show that the promises of confidentiality induced him into divulging the existence of the *Hustler* magazine in his mailbox. Therefore, he cannot show that any

alleged promises caused him to "actually change his position or do some act to his injury which he otherwise would not have done." *Peralta v. Cendant Corp.*, 123 F. Supp. 2d 65, 86 (D. Conn. 2000) (*citing Reinke v. Greenwich Hospital Assn.*, 175 Conn. 24, 28-29 (Conn. 1978)).

In sum, Mr. Perugini has not presented evidence from which a reasonable jury could conclude that he was made a definite and clear promise or that he relied to his detriment upon any such promise – both of which are essential elements to establishing his promissory estoppel claim. As with the other claims, there are additional issues here that the Court need not address. The Defendants are granted summary judgment on Plaintiff's promissory estoppel claim.

## VI.

Therefore, the Court GRANTS Defendants' Motion for Summary Judgment [doc. # 60] and DENIES Plaintiff's Motion for Summary Judgment [doc. #62]. **The Clerk shall enter judgment for all Defendants and close this file.**

IT IS SO ORDERED,


/s/ _____Mark R. Kravitz_____
United States District Judge


Dated at New Haven, Connecticut: **October 6, 2009**.